IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| American Wild Horse Campaign,            )<br>                                          )<br>   *Plaintiff*,                           )<br>                                          )<br>   v.                                     )     Case No. 1:25-cv-001163<br>                                          )<br>Bureau of Land Management, *and* U.S.     )<br>Department of the Interior,               )<br>                                          )<br>   *Defendants*.                          )<br>_____) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
FOR VIOLATION OF THE FREEDOM OF INFORMATION ACT**

1. This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to compel the Bureau of Land Management ("BLM") to release all non-exempt information responsive to a request submitted by Plaintiff American Wild Horse Campaign ("AWHC")[1] concerning the adoption of wild horses and burros to certain individuals. That information is essential to AWHC's efforts to monitor and educate the public regarding the federal government's management, care, and disposition of wild horses and burros, including BLM's policies and implementation of laws (including the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331-1340) related to the welfare of these iconic, federally protected animals.

2. As detailed below, AWHC sought this information through a FOIA request submitted in October 2023. However, AWHC's request has been languishing without any final

---

[1] The legal name of the Plaintiff organization is American Wild Horse Preservation Campaign, but it also officially does business under the abbreviated names American Wild Horse Campaign and American Wild Horse Conservation. Because all of these names pertain to the same legal entity, we use "American Wild Horse Campaign" or "AWHC" throughout this Complaint to refer to this organization, given that this was the organizational name used most commonly in correspondence with the agency for the FOIA request at issue in this case.

response from Defendants for well over a year—far longer than the twenty working day deadline that Congress established in FOIA. By failing to produce to AWHC all non-exempt information responsive to AWHC's FOIA requests—let alone even acknowledge the number of responsive documents and pages identified by Defendants through a search for records—Defendants have improperly withheld this information in violation of FOIA.

3. The information that Defendants have improperly withheld is critical to AWHC's ongoing efforts to educate the public about how Defendants are implementing their statutory responsibilities and spending taxpayer money on the management, care, and disposition of federally protected wild horses and burros, and especially on the highly controversial wild horse and burro adoption programs. Defendants have spent hundreds of thousands of dollars of taxpayer money on developing, and paying private individuals through, "incentive" programs for wild horse and burro adoption, which have foreseeably resulted in widespread fraud, abuse, and neglect. Indeed, multiple investigations have confirmed that BLM's Adoption Incentive Program ("AIP") has enriched bad actors while dramatically increasing the number of wild horses and burros removed from the range that are adopted into abusive homes, subjected to inhumane treatment, and ultimately sold for slaughter abroad.

4. AWHC's request was submitted to BLM with the intent of understanding and educating the public about BLM's activities by obtaining information about the adoption and sale of federally protected wild horses and burros, including the agency's use of financial incentives to encourage the adoptions and any oversight of adopters and buyers (or lack thereof).

5. AWHC has constructively exhausted all administrative remedies and informal avenues to obtain the requested records, and is therefore entitled to judicial review of this matter,

as Defendants have failed to provide responsive information or issue a final response to the request within the deadlines established by FOIA.

## JURISDICTION AND VENUE

6.  This Court has jurisdiction pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

7.  Venue is properly vested in this Court pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391.

## PARTIES

8.  Plaintiff AWHC is a national 501(c)(3) nonprofit organization that is the nation's leading voice on protecting and preserving wild horses and burros. AWHC's mission is to defend America's wild horses and burros, protect their freedom, preserve their habitat, and promote humane standards of treatment. AWHC's mission is endorsed by a broad-based coalition of public interest groups, environmentalists, humane organizations, and historical societies, representing approximately 700,000 supporters. AWHC—which is an official trade name of the legal entity American Wild Horse Preservation Campaign, *see supra* note 1—is the requester of the records at issue.

9.  Defendant BLM is an agency within the federal government with possession of the records at issue.

10. Defendant Department of the Interior is the parent agency of BLM and is accordingly a federal agency with possession of the records at issue.

## FACTS GIVING RISE TO AWHC'S CLAIMS

A. **BLM's Management of Wild Horses and Burros**

10. Finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West," and "contribute to the diversity of life forms within the Nation and enrich the lives of the American people," Congress enacted the Wild Free-Roaming Horses and Burros Act ("WHA"), 16 U.S.C. §§ 1331–1340, in 1971. It states that "wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death." 16 U.S.C. § 1331.

11. The Secretary of the Interior "shall manage wild free-roaming horses and burros as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." *Id.* § 1333(a). To that end, the WHA directs the Secretary to "maintain a current inventory" of wild horses and burros and to use that inventory to "determine appropriate management levels" on public lands, and "make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals." *Id.* § 1333(b)(1).

12. If BLM decides to remove wild horses or burros from public lands, the WHA allows the public to adopt them "for private maintenance and care," if BLM "determines" there are "qualified individuals" who "can assure humane treatment and care (including proper transportation, feeding, and handling)." 16 U.S.C. § 1333(b)(2)(B).

13. Since Congress enacted the WHA, BLM has managed wild horses principally by removing from public lands animals it deems "excess." 16 U.S.C. §§ 1332(f); 1333(b)(2). Although BLM may allow the adoption and sale of animals it has removed from the range, as a practical matter, BLM removes vastly more animals from the range each year than the public

adopts or purchases. The vast majority of wild horses and burros removed from the range are housed in BLM-owned corrals or on privately-owned pastures. Because this system of removing wild horses from public lands and shipping them to live in rented pastures is costly, BLM has proposed various ways to more cheaply—but less humanely—manage these animals.

14. Although the WHA states that unadoptable animals may be "destroyed in the most humane and cost efficient manner possible," *id.* § 1333(b)(2)(C), Congress has forbidden BLM's use of federal funds for the slaughter of unadopted wild horses, or for their sale for slaughter. *See In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1059 n.3 (9th Cir. 2014) ("Congress has never appropriated funds for extermination, as opposed to ongoing maintenance, of excess horses even if not adopted."). In 2021, Congress provided that federal funds "shall not be available for . . . the destruction of any healthy, unadopted, and wild horse or burro" or "the sale of a wild horse or burro that results in the destruction of the wild horse or burro for processing into a commercial product." Consol. Appropriations Act, 2021, Pub. L. 116-260 § 419(e).

15. Congress places an annual appropriations prohibition on the U.S. Department of Agriculture's use of federal funds to inspect horses at slaughter, effectively prohibiting horse slaughter (wild or otherwise) for human consumption in the United States. However, the slaughter of horses from the United States—including, at times, wild horses and burros—may nevertheless occur in Canada and Mexico. Such horses are purchased at so-called "slaughter auctions" or "kill pens" and are then exported for slaughter to Canada and Mexico. BLM's own data reveal that between 2002 and 2008, "about 2,000 wild horses whose legal titles were obtained by private citizens either through adoption or purchase were slaughtered." "During that same period, another 90 wild horses whose title still belonged to BLM were retrieved from slaughterhouses by BLM and by wild horse groups."

16. BLM has previously endured intense public scrutiny, federal investigations, and congressional inquiries regarding its actions that have caused or failed to prevent wild horses and burros from being slaughtered.

### B. BLM's Adoption Incentive Program

17. Established in 2019 and nominally revised in 2022, the AIP sought to "to increase the number of adoptions of untrained wild horses and burros placed into private care through offering financial incentives." *See* IM 2019-025; IM 2022-014. Under the AIP, BLM pays members of the public up to $1,000 in taxpayer funds for each wild horse or burro adopted through the program. Adopters receive title to wild horses and burros one year after the date of adoption.

18. Lax oversight, coupled with the perverse incentive created by the AIP, has led to an influx of wild horses and burros being sold at auctions catering to the slaughter industry. Indeed, the AIP creates an incentive for individuals more motivated by cash payments than by the welfare of adopted animals to adopt as many animals as possible, house them as cheaply as possible for a year until they can receive title to the animals and $1,000 in federal funds, and then offload the animals at slaughter auctions, where these individuals may earn up to another roughly $500 per animal. Moreover, because BLM has taken the position that individuals selling these animals at auctions after titling are not violating any law or policy (nor does BLM bring any enforcement actions against these individuals), these same individuals may then return and adopt more animals through the AIP and repeat the process, thus enriching themselves at the expense of taxpayers and of the wild horses and burros that Congress sought to protect.

19. AWHC is extremely concerned that BLM is expending taxpayer dollars on a program that foreseeably results in federally protected wild horses and burros being sent to live

6

in inhumane conditions before being slaughtered in a manner expressly prohibited by Congress. AWHC has previously submitted dozens of FOIA requests to BLM to collect, analyze, and collate this information into a useful format that reveals the true extent of the AIP's slaughter crisis. In this manner, AWHC has proven that hundreds of AIP-adopted wild animals have been sold at slaughter auctions shortly after title transferred.

20. AWHC's efforts led to a major New York Times expose. *See* Dave Philipps, *Wild Horses Adopted Under a Federal Program Are Going to Slaughter*, NY TIMES (June 23, 2023), https://shorturl.at/ciL05. As that article described, "instead of going to good homes, truckloads of horses were dumped at slaughter auctions as soon as their adopters got the federal money." *Id*. The article was based in large part on information about the AIP that AWHC had obtained through investigations and FOIA requests, as well as on the New York Times' own research.

21. AWHC has continued to submit FOIA requests seeking information concerning the AIP, including information that will reveal whether animals rescued by AWHC and its partners from slaughter auctions were adopted through the AIP. The information gleaned from these requests and from other sources have shown that there is widespread fraud and abuse within the AIP, not only by individuals but also by numerous groups of related individuals. Indeed, AWHC has documented numerous instances where such groups have adopted BLM wild horses and burros, received the incentive payments through the program, and then promptly sent their animals to be sold for slaughter for additional profit. In one such case, a group of twenty-six individuals—dubbed the "Tyer Group"—has adopted at least 151 wild horses and burros through the AIP, the majority of which were titled to the same five addresses in Tahlequah, Oklahoma. AWHC confirmed that at least fifty-two of the animals adopted by the Tyer Group were sold at slaughter auctions. Meanwhile, it is AWHC's understanding that the Tyer Group has collected at

least $129,000 in taxpayer funds through the AIP, plus additional profit from the sale of the animals at slaughter auctions.[2]

## C. The Freedom of Information Act (FOIA)

22. "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citations omitted). FOIA was enacted to "permit access to official information long shielded unnecessarily from public view" by creating a "right to secure such information from possibly unwilling official hands." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citation omitted). "[D]isclosure, not secrecy, is the dominant objective of the Act." *John Doe*, 493 U.S. at 152 (citation omitted).

23. FOIA requires agencies of the federal government to conduct a reasonable search for requested records and to release them to a requester, unless one of nine specific statutory exemptions applies to the requested information. 5 U.S.C. § 552(a)(3), (b).

24. FOIA requires federal agencies to release all non-exempt segregable information that is requested. *Id.* § 552(b).

25. Upon receiving a FOIA request, an agency generally has twenty working days to respond, *id.* § 552(a)(6)(A)(i), and twenty working days to respond to any appeal of its initial determination, *id.* § 552(a)(6)(A)(ii).

---

[2] The Tyer Group includes individuals who have participated in several rounds of AIP adoptions, as well as individuals with criminal records for offenses including child sex abuse, manufacture and/or delivery of controlled dangerous substances, domestic violence, and check fraud. Despite some of these individuals having criminal records including for violent behavior, BLM did not prohibit these individuals (through background checks or otherwise) from adopting wild horses that the WHA requires to be treated humanely at all times.

26. A requester has exhausted administrative remedies "if the agency fails to comply" with either twenty-day deadline. *Id.* § 552(a)(6)(C)(i). In that event, FOIA authorizes the requester to invoke the jurisdiction of a federal court to obtain the requested information. *Id.* § 552(a)(4)(B).

### D. AWHC'S FOIA Request

27. Due to its myriad concerns about the AIP—including the Program's contribution to the slaughter of federally protected wild horses and burros, in direct contravention of Congress's express prohibition, and the defrauding of the agency by coordinated groups—AWHC submitted a FOIA request to BLM on October 18, 2023 via FOIA.gov, seeking "all records in any form or format, including attachments, that discuss or describe BLM horses or burros adopted or sold to" twenty-five people determined to be members of the "Tyer Group." *See* Ex. A at 001-02. The FOIA request specifies that the "timeframe of th[e] request is January 1, 2019, through the date th[e] request is processed." *Id.* at 002.

28. On November 6, 2023, AWHC emailed BLM's FOIA officer to request that BLM provide a tracking number for the organization's FOIA request. *See* Ex. A. at 011. The agency did not respond to that email.

29. On November 15, 2023, AWHC again emailed BLM's FOIA officer to request that BLM provide a tracking number for the organization's FOIA request. *See* Ex. A. at 012.

30. On November 16, 2023, BLM finally responded to AWHC's email and informed AWHC that its FOIA request had been assigned the tracking number DOI-BLM-2024-000049. *See* Ex. A. at 012. BLM also informed AWHC that the agency's "FOIA Team will send [AWHC its] acknowledgement letter soon." *Id.*

31. On November 17, 2023, AWHC emailed BLM's FOIA officer to request that the agency provide an estimated date by which BLM expected to complete its response to AWHC's FOIA request, i.e., an "estimated of completion." *See* Ex. A. at 014. BLM did not respond to AWHC's email.

32. On December 15, 2023, AWHC again emailed BLM's FOIA officer to request that the agency provide an estimated date of completion. *See* Ex. A. at 015. BLM did not respond to that email.

33. On January 19, 2024, AWHC again emailed BLM's FOIA officer to request that the agency provide an estimated date of completion. *See* Ex. A. at 016. BLM did not respond to that email.

34. On February 19, 2024, AWHC again emailed BLM's FOIA officer to request that the agency provide an estimated date of completion. *See* Ex. A at 019.

35. On February 20, 2024, nearly four months after AWHC first submitted its FOIA request, BLM finally replied to AWHC via email. *See* Ex. A at 19. BLM informed AWHC that the agency "is experiencing a backlog of FOIA requests that has impacted [its] ability to process [the] request." BLM generically informed AWHC that it "will be providing updates shortly" on twenty-seven of AWHC's FOIA requests currently pending before the agency, including the request here at issue. *Id.* BLM did not provide AWHC with any responsive records, a date by which it would respond to AWHC's request, or a date by which the production of responsive records would be complete. Nor did BLM provide AWHC with any anticipated date by which it would conduct a search for records responsive to this request, or when it would notify AWHC of the number of responsive records and pages discovered during any search by the agency.

10

36. Having received no further communication from BLM by March 15, 2024, AWHC emailed BLM that day requesting another status update, including "an estimated date of completion." *See* Ex. A at 022.

37. BLM replied to AWHC's request for a status update via email on March 18, 2024. *See* Ex. A at 021. BLM's response did not produce any records responsive to AWHC's FOIA request and, despite purporting "to provide [AWHC] an update on" that request, BLM's response did not provide any dates by which AWHC should expect to *begin* receiving those records or by which BLM would *complete* its statutorily compelled disclosures. Instead, BLM again pointed to a vague "series of events within BLM [which] resulted in an unprecedented backlog" in the agency's processing of FOIA requests. *Id.* BLM concluded by telling AWHC to try to obtain a status update again in "60-90 days." *Id.*

38. Having received no further communication from BLM regarding this FOIA request, AWHC again emailed BLM on April 19, 2024 to request a status update, including an estimated date of completion. *See* Ex. A at 023. BLM replied to that email on April 22, 2024, again claiming unspecified impacts to Defendants' "ability to process [Plaintiffs'] request," and promising to "provid[e] updates shortly . . . ." *Id.*

39. On May 17, 2024, AWHC emailed BLM again to request a status update about this FOIA request, including an estimated date by which BLM expected to complete its response to the request. *See* Ex. A at 025-026. BLM replied to that email on May 21, 2024, again claiming unspecified impacts to BLM's "ability to process [this] request," and promising to "provid[e] updates shortly . . . ." *Id.* at 21.

40. On June 21, 2024, AWHC emailed BLM again to request a status update about this FOIA request, including an estimated date by which BLM expected to complete its response

11

to the request. *See* Ex. A. at 029. AWHC sent virtually identical requests to BLM subsequently on July 19, August 16, September 20, October18, November 15, 2024. *See id.* at 030-036. Insofar as AWHC is aware, BLM never responded to any of these requests for a status update.

41. AWHC has not received any further communications from BLM concerning the FOIA request here at issue.

42. More than twenty working days have elapsed since AWHC submitted its FOIA request to BLM on October 18, 2023.

43. To date, BLM has neither identified, nor provided any records, responsive to AWHC's FOIA request. Nor has BLM made a determination as to the number of responsive records, what information will be produced and what information will be withheld, or the timeline for production of any responsive records.

## CLAIMS FOR RELIEF

44. AWHC hereby incorporates the facts and allegations contained in the preceding paragraphs.

45. By failing to provide AWHC all non-exempt information that AWHC has requested under FOIA within the statutory deadline set by Congress, BLM and the Department of the Interior are in violation of FOIA, 5 U.S.C. § 552(a)(3).

46. AWHC has a right to obtain the requested information, and BLM and the Department of the Interior have no lawful basis for withholding it, nor have the agencies cited any basis for doing so.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(1) Declare that Defendants are in violation of FOIA;

(2) Order Defendants to immediately release to Plaintiff all non-exempt information responsive to Plaintiff's FOIA requests at issue in this case;

(3) Award Plaintiff its costs and attorneys' fees; and

(4) Award Plaintiff such other and further relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ Matthew R. Arnold*
Matthew R. Arnold
DC Bar No. 1618616
(843) 718-4513
matt@eubankslegal.com

William S. Eubanks II
DC Bar No. 987036
(970) 703-6060
bill@eubankslegal.com

EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006

*Counsel for Plaintiff*